IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DANA SOVEY,**                                        Case Number 1:13cv1645

      Plaintiff,

      v.                                              Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                      MEMORANDUM OPINION AND ORDER


### INTRODUCTION

Plaintiff Dana Sovey seeks judicial review of Defendant Commissioner of Social Security's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons given below, the Court affirms in part and remands in part the Commissioner's decision denying benefits.

### PROCEDURAL BACKGROUND

Plaintiff filed applications for SSI and DIB on August 24, 2010, and August 25, 2010, respectively. (Tr. 152, 221, 228). She alleged disability due to anxiety, panic attacks, and depression since June 15, 2005. (Tr. 222, 228, 257). Her claims were denied initially and on reconsideration. (Tr. 166, 170, 176, 183). Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 190). At the hearing, Plaintiff, represented by counsel, and a vocational expert ("VE") testified. (Tr. 17). On June 8, 2012, the ALJ concluded Plaintiff was not disabled. (Tr. 149). Plaintiff's request for review was denied, making the decision of the ALJ the final

decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. On July 30, 2013, Plaintiff filed the instant case. (Doc. 1).

FACTUAL BACKGROUND

*Plaintiff's Background, Vocational Experience, and Daily Activities*

Born January 10, 1971, Plaintiff was 34 years old on the alleged onset date. (Tr. 159). She has a high school education and past relevant work experience as a server, daycare worker, retail manager, cashier, receptionist, and telemarketer. (Tr. 158, 676). Plaintiff said she stopped working in 2008 because work "was interfering with [her] school work and [her] studying". (Tr. 257).

In a function report, Plaintiff described herself as "a very sad, and depressed person", who suffered every day, had no ambition, and could not see straight as a result of taking too much medication. (Tr. 274). She lived in a house with her parents, who helped take care of her two children. (Tr. 267). Concerning daily activities, Plaintiff said she took medicine in the morning and her parents looked after her baby while she rested. (Tr. 268, 285, 288). Regarding personal care, Plaintiff averred she had trouble gathering the energy to get dressed, comb her hair, or shave. (Tr. 269). She required reminders to take medication and maintain personal hygiene. (Tr. 269). Plaintiff said she did not do any cooking because she could not stand or lift and would be too shaky. (Tr. 269). Plaintiff did not clean or do yard work due to shakiness and blurred vision, never went outside (except to see the doctor), did not drive due to anxiety and nervousness, and did not shop because she got anxiety in the stores. (Tr. 270, 287-88). She could not concentrate well enough to handle money, although she paid some bills. (Tr. 271, 287-88). Plaintiff watched television "sometimes" and spent time with her family on Sundays. (Tr. 271, 288). She had trouble lifting, carrying, and walking due to weakness from her medication,

2

dizziness, and depression. (Tr. 272, 289-90). Plaintiff provided inconsistent reports concerning her ability to get along with authority figures. (Tr. 272, 289-90).

At the hearing, Plaintiff said her symptoms began after she got divorced in 2004. (Tr. 53). From her medications, she complained of side effects including shaking, pacing, rocking back and forth, and fatigue. (Tr. 38-40).

During a typical day, Plaintiff helped her mother get her three-year-old son ready for school but did not help with homework because she could not concentrate and did not attend parent/teacher conferences because she would get too nervous. (Tr. 24-25). In addition, Plaintiff had never spoken to any of her children's teachers. (Tr. 25). Plaintiff had limited conversations with visitors to the house, maintained personal hygiene, did not cook, could do light cleaning and wash dishes, did not shop, and used a computer for Facebook or solitaire. (Tr. 26-33). Although Plaintiff was capable of driving, she did not have a license because of a DUI. (Tr. 26). She said she did not take public transportation, but did ride a bus "[b]ack in [her] school days." (Tr. 26-27). She had a boyfriend in January of 2012, with whom she would either hang out at home or eat fast-food in the park. (Tr. 33-35). Prior to this boyfriend, she had relationships with three other men. (Tr. 36).

Plaintiff said she earned an associate's degree for medical assisting from Remington College in 2007 or 2008. (Tr. 56-57). In this program, she said she took two classes over the course of eight months and was successful because she was on medication. (Tr. 57).

***Medical Evidence***

On December 23, 2005, Plaintiff went to Marymount Hospital's emergency room at the recommendation of her physician with symptoms of major depression, anxiety, and suicidal ideation. (Tr. 374-75). Plaintiff was admitted for inpatient treatment, although her condition was

good. (Tr. 376). She was discharged on February 1, 2006 and diagnosed with major depression (single episode, severe) and panic and anxiety with agoraphobia, assigned a global assessment of functioning ("GAF") score of 65[1], and referred to Northeast Ohio Health Services for continued care and to resolve employment and housing problems. (Tr. 380-81).

On October 30, 2006, Plaintiff was admitted for treatment at Marymount after she tried to kill herself by slitting her forearms with scissors. (Tr. 363-64). She averred medication was not helpful and admitted to drinking at a party that weekend. (Tr. 363). Plaintiff did not appear intoxicated but a toxicology screening was positive for cocaine. (Tr. 364). During her course of treatment, Jung El-Mallawany, M.D., said Plaintiff had been fired from three different jobs because she could not concentrate, was facing eviction, and had been drinking regularly. (Tr. 365-66). Dr. El-Mallawany diagnosed bipolar disorder (depressed phase) and substance abuse disorder then assigned a GAF score of 20[2]. (Tr. 366).

On December 28, 2008, Plaintiff went to Marymount because she was out of medication but was otherwise stable. (Tr. 379). She was discharged from follow-up treatment due to lack of contact. (Tr. 379).

Plaintiff returned to Marymount in June 2009 because she got upset with her boyfriend, suffered an anxiety attack, and threw a glass pitcher at him. (Tr. 812-818). She expressed

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood or mild insomnia) OR some difficulty in social, occupational, or school functioning, (e.g., occasional truancy or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships." *Id*., at 34.
2. A GAF score between 11 and 20 indicates "[s]ome danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)." *DSM-IV-TR*, at 34.

frustration because she had a baby with a man who was abusive and she was unemployed. (Tr. 815). Plaintiff said her mother looked after the baby. (Tr. 815). She was diagnosed with bipolar disorder with anxiety, tested positive for cocaine and opiates, was prescribed Abilify and Cymbalta, and left in good condition. (Tr. 816).

In July of 2009, Plaintiff again went to Marymount where she complained of social stressors including a bad marriage and physically abusive boyfriend. (Tr. 812). She admitted to having thoughts of stabbing herself or jumping off of a bridge. (Tr. 812). The treating physician diagnosed Plaintiff with major depression with suicidal ideation and admitted her to Lutheran Hospital for inpatient psychiatric treatment. (Tr. 813).

Plaintiff was taken by ambulance to Marymount on February 15, 2010 due to attempted drug overdose, suicidal ideation, depression, fatigue, poor appetite, low energy, poor concentration, poor interest, paranoia, occasional auditory and visual hallucinations, and feelings of hopelessness and worthlessness. (Tr. 384-86, 394). A toxicology screening was positive for benzodiazepines. (Tr. 389). Plaintiff was diagnosed with bipolar disorder, mixed, severe with psychotic features; assigned a GAF of 25[3]; recommended for individual and group therapy; and started on psychotropic medicines. (Tr. 384, 394). After a week of treatment, she was doing well and discharged in stable condition. (Tr. 384).

Plaintiff treated at Connections from February 2010 through November 2010. (Tr. 489-526). During this time, she complained of difficulty falling and staying asleep, depressive symptoms, anxiety, excessive worries, panic attacks, irritability, repetitive nightmares, and erratic appetite – likely due to family-related stressors. (*Id.*). Plaintiff's condition was usually

---

3. A GAF score between 21 and 30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends).

unchanged or stable, her medication was adjusted, and she was routinely noted to be compliant with treatment. (*Id*.).

Plaintiff received weekly home health services from the Visiting Nurse Association of Cleveland ("VNA") from August 13, 2010 through November 3, 2010 for ongoing medication monitoring due to severe depression secondary to ineffective coping and anxiety. (Tr. 415-16, 420, 460, 468). During one visit, the nurse indicated Plaintiff could not wait to move out and said she would help Plaintiff get her own apartment and daycare center privileges so she could work part time or go to school for an associate's degree. (Tr. 450). Records indicated Plaintiff isolated herself most of the day in her bedroom with her seventeen-month old baby. (Tr. 451). Plaintiff said she did not see the need for continuing home health services, was not homebound, and requested discharge. (Tr. 466, 469).

On January 11, 2011, Plaintiff's case worker at Connections completed a medical report, indicating Plaintiff suffered from poor time orientation, paranoia, irrational thought process, poor concentration, confusion, memory impairment, chronic insomnia, and illogical thought process and that Plaintiff's parents cooked her meals and took care of Plaintiff's two-year-old son. (Tr. 536). VNA services were reordered due to Plaintiff's difficulty with medication compliance. (Tr. 537).

On January 25, 2011, a different case worker at Connections, completed a medical report and reported similar findings. (Tr. 541-42). The case worker emphasized Plaintiff's tendency to isolate herself, have a racing thought process, and suffer from panic and anxiety attacks, chronic confusion, and poor memory. (Tr. 541).

From January through March of 2011, Plaintiff resumed services with the VNA due to increased depression and self-isolation. (Tr. 543-80, 558). Plaintiff requested termination of services and the case manager indicated this was "often the pattern" with Plaintiff. (Tr. 549).

On June 16, 2011, Dr. Minn-Jinn completed a medical source statement concerning Plaintiff's mental capacity, where she concluded Plaintiff had a poor ability to maintain attention and concentration; respond appropriately to changes in routine; interact appropriately with the public, coworkers, and supervisors; deal with work stress; and complete a normal workday and workweek without interruption for psychologically based symptoms. (Tr. 582-83). Dr. Minn-Jinn further indicated Plaintiff had a good ability to maintain appearance and fair ability to follow work rules, use judgment, maintain regular attendance, and understand, remember, and carry out simple and complex job instructions. (Tr. 582-83). In support of her findings, Dr. Minn-Jinn pointed to Plaintiff's chronic anxiety, depression, violent mood swings, and chronic inability to sleep or complete activities of daily living. (Tr. 583).

Plaintiff was sent to the emergency room by Dr. Minn-Jinn's nurse practitioner due to suicide attempts on August 5, 2011. (Tr. 599). She stayed at Marymount until August 9 after overdosing on a "bunch of pills", having continuous suicidal ideation, and attempting to slash her hand with a knife. (Tr. 591, 599, 608). There, she reported not sleeping for a few days and taking other people's medication. (Tr. 599, 608). A toxicology screening was positive for benzodiazepines and benzodiazepine abuse was noted. (Tr. 591). Although Plaintiff said she wanted to move out of her parents' house, she added that "things [were] good". (Tr. 594). Plaintiff was diagnosed with schizoaffective disorder (post overdose) and assigned a GAF score

of $10^4$. (Tr. 591). Following treatment, including medication management, Plaintiff was discharged in stable condition and noted to be "doing well". (Tr. 591-92).

On October 2, 2011, Plaintiff was taken by ambulance to Marymount following another suicide attempt, this time after taking an "assortment" of pills with alcohol. (Tr. 623, 625).

A few weeks later, Plaintiff returned to the hospital because she was agitated, not sleeping, and not eating. (Tr. 762). She was diagnosed with bipolar disorder and discharged. (Tr. 763).

### State Agency Opinion Evidence

On March 8, 2011, state agency medical consultant David Dietz, Ph.D., reviewed Plaintiff's medical records and found "insufficient evidence" to assess disability prior to December 30, 2009. (Tr. 94-95, 106-07). However, after January 1, 2010, Dr. Dietz concluded Plaintiff had moderate limitations in abilities to complete activities of daily living, social functioning, and maintain concentration, persistence, or pace. (Tr. 95, 107). Dr. Dietz noted Plaintiff's completion of an associate's degree and found Plaintiff markedly limited in ability to interact appropriately with coworkers and supervisors, maintain attention and concentration, understand and carry out detailed instructions, complete a normal workday and workweek, and respond appropriately to changes in the work setting. (Tr. 94, 97-98, 106, 109-110). Dr. Dietz restricted Plaintiff to three or four step tasks without strict production standards or schedules and no more than superficial social interactions where changes were infrequent and could be easily explained. (Tr. 98, 110).

On November 11, 2011, consultative examiner Herschel Pickholtz, M.D., examined

---

4. A GAF score between 1 and 10 indicates "[p]ersistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death." *DSM-IV-TR*, at 34.

Plaintiff and discussed her personal, educational, and vocational history. (Tr. 675). He indicated Plaintiff received a college diploma in 2007 with a grade point average of 3.5. (Tr. 675). Plaintiff had two children who she raised with help from her parents. (Tr. 675). She had five siblings, with whom she said she was close to, and a history of abuse at the hands of ex-boyfriends. (Tr. 675). Plaintiff reported a history of involuntary and voluntary hospitalizations and use of psychiatric medications. (Tr. 676). With psychiatric help, Plaintiff said she had been to resume most daily duties and responsibilities until she suffered a bad reaction to medication. (Tr. 676). Plaintiff denied use of street drugs since she last used "grass" in 1990 and reported consuming minimal amounts of alcohol. (Tr. 676). Regarding daily activities, Plaintiff said she changed her clothes three times a week, did not know how often she washed her hair, and did not do household chores, although she used to. (Tr. 680). She used a cell phone, watched television, watched her child with help from her mother, and visited with relatives once per week. (Tr. 680). Dr. Pickholtz noted Plaintiff had a history of serious or severe psychiatric deterioration under conditions less demanding than work. (Tr. 676).

Dr. Pickholtz assigned a GAF of 55[5] and found Plaintiff had an estimated IQ in the low-average range. (Tr. 682). He found she would have low-average capacity for attention and concentration, mild range of impairment in levels of pace and persistence, slight range of impairment in capacities to perform one- and three- step tasks, and somewhat impaired capacities to relate to coworkers and supervisors with medications. (Tr. 682). With motivation and psychiatric support, she would be able to handle the stress of unskilled or low-skilled labor. (Tr. 682).

---

5. A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers). *Id.*, at 34.

State agency medical consultant Bruce Goldsmith, Ph.D., reviewed Plaintiff's records and affirmed Dr. Dietz' findings as written on November 17, 2011. (Tr. 128, 144).

***ALJ Decision***

The ALJ determined Plaintiff suffered from severe impairments of affective disorder/bipolar disorder, anxiety disorder, and polysubstance abuse. (Tr. 154). Next, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. (Tr. 155). The ALJ found Plaintiff had the RFC to perform a range of full work at all exertional levels, except she was limited to tasks that were simple and routine and would be precluded from commercial driving and tasks that involved high production quotas, strict time requirements, arbitration, negotiation, or confrontation. (Tr. 156). Further, Plaintiff could not direct the work of others or be responsible for the safety of others and was limited to superficial interactions with co-workers and the public. (Tr. 156). Considering Plaintiff's age, education, work experience, RFC, and VE testimony, the ALJ determined Plaintiff could work as a cleaner, dishwasher, laundry worker, dining room attendant, or housekeeper. (Tr. 68-70, 159-60). Thus, the ALJ determined Plaintiff was not disabled. (Tr. 160).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y*

*of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 and § 416.920 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's RFC and can she perform past relevant work?

5. Can the claimant do any other work considering her RFC, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden then shifts to the Commissioner at step five to establish whether the claimant has the RFC to perform available work in the national

11

economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if she satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f); 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Plaintiff argues the ALJ: 1) did not adequately explain his decision regarding the listings, particularly listing 12.04(C); 2) failed to follow the treating physician rule with respect to Dr. Minn-Jinn; and 3) did not support his RFC determination with substantial evidence. (Doc. 16). Each argument is addressed in turn.

### Listing 12.04

Plaintiff maintains the ALJ erred at step three of the sequential analysis by failing to fully explain his reason for finding Plaintiff did not meet or equal listing 12.04(C) – mental disorder. (Doc. 16, at 19-22).

In order to establish disability due to a mental impairment on the basis of medical evidence, a claimant must satisfy one of the nine diagnostic categories for mental impairments contained in 20 C.F.R., Part 404, Subpt. P, App. 1, § 12.00. *Abbott v. Sullivan*, 905 F. 2d 918, 923 (6th Cir. 1990). Most of the listings impose two requirements: first that the claimant has particular signs or symptoms; and second, that the symptoms result in a specified degree of functional limitation. *Abbott*, 905 F. 2d at 923. The symptoms are found in paragraph A for each listing and, hence, are referred to as "paragraph A criteria". *Id.* The "set of impairment-related functional limitations" are contained in paragraph B of the listings and are referred to as "paragraph B criteria". App. 1, § 12.00. There are additional functional criteria in paragraph C

12

for listing impairment 12.04. App. 1, § 12.00. However, "paragraph C criteria" are assessed only if paragraph B criteria are not satisfied. *Id*. A claimant has a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B or A and C of the listed impairment are satisfied. *Id*.

Here, Plaintiff does not challenge the ALJ's decision with respect to paragraphs A and B, but asserts the ALJ erred by: 1) providing no analysis of the paragraph C criteria; 2) erroneously finding that she did not satisfy listing 12.04(C). *See* App. 1, § 12.04.

Plaintiff's first argument is without merit. Indeed, there is no "heightened articulation standard" in considering the listing of impairments; rather, the court considers whether substantial evidence supports the ALJ's findings. *Snoke v. Astrue*, 2012 WL 568986, at *6 (S.D. Ohio 2012) (quoting *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006)).

 Turning to Plaintiff's second argument, in order to meet Paragraph C criteria, a claimant must prove: 1) repeated episodes of decompensation, each of extended duration; 2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. App. 1, § 12.04(C).

Plaintiff argues she meets paragraphs C(2) and C(3) of listing 12.04, which are each addressed separately below. (Doc. 16, at 21).

Listing 12.04(C)(2)

As stated, listing 12.04(C)(2) requires Plaintiff have a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change

in the environment would be predicted to cause the individual to decompensate. App. 1, § 12.04(C)(2). In support of her argument that she meets this requirement, Plaintiff points to Dr. Pickholtz' consultative examination finding serious or severe psychiatric deterioration under conditions less demanding than work. (Doc. 16, at 21; Tr. 676).

However, Dr. Pickholtz went on to conclude that Plaintiff's capacity to handle the pressures of work was somewhat impaired, but with motivation and psychiatric support, she could handle the stress of unskilled or low-skilled labor. (Tr. 682). Moreover, as the ALJ recalled, Dr. Pickholtz found Plaintiff's bipolar disorder was in partial remission and assigned a GAF indicative of moderate symptoms. (Tr. 157, 681). For these reasons, the ALJ's finding regarding 12.04(C)(2) is supported by substantial evidence.

Listing 12.04(C)(3)

Listing 12.04(C)(3) requires a showing of a "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." App. 1, § 12.04(C)(3). A "highly supportive living arrangement" refers to "shelters or group homes, inpatient psychiatric treatment, or an inability to live on one's own." *Rosic v. Comm'r of Soc. Sec.*, 2010 WL 3292964, at * 7 (N.D. Ohio). Plaintiff argues she meets this requirement, and in support, points to Dr. Minn-Jinn's finding that Plaintiff required the assistance of a home nurse to administer and manage medications, and the assistance she received from two case workers at Connections and her parents. (Doc. 16, at 21).

While Plaintiff's living situation warranted a particularly close and careful review, the Court finds the Commissioner's decision supported by substantial evidence. Indeed, as the ALJ determined, Plaintiff was able to care for personal hygiene and two children (with the help of her parents), and could prepare light meals, drive, and wash dishes. (Tr. 24-36, 155). Further, the

14

ALJ found Plaintiff had moderate difficulty in social functioning, reasoning she was able to live with her parents and children, have several boyfriends during the relevant period, and have 500 friends on Facebook. (Tr. 24-36, 155). Plaintiff also attended college for eight months during the relevant period, where she interacted with other students. (Tr. 56-57, 155). In her "school days", Plaintiff said she took the bus, although she testified she could not do so anymore. (Tr. 26-27, 155). The ALJ noted Dr. Pickholtz' finding that Plaintiff's ability to relate to coworkers and supervisors was somewhat impaired, but not preclusive of work. (Tr. 155). Finally, the state agency examiners determined Plaintiff did not satisfy listing 12.04(C). (Tr. 95, 107, 124, 140).

Moreover, as the Commissioner pointed out, Plaintiff worked with case workers to secure her own apartment and daycare privileges so she could go to school or work, and twice requested termination of VNA services. (Doc. 19, at 12-13; Tr. 450). Veritably, Plaintiff's desire to move out of her parents' home is not the same as actually living on her own; however, the discussion suggests Plaintiff was capable of moving out.

For the above-stated reasons, the ALJ's finding that Plaintiff did not meet listing 12.04(C) is supported by substantial evidence. *See*, *Jones v. Comm'r of Soc. Sec.*, 336 F.3d at 477 (even where substantial evidence supports an alternative result, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ.").

### *Treating Physician Rule*

Next, Plaintiff claims the ALJ erred with respect to his treatment of Dr. Minn-Jinn's opinion. Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical

15

impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* The ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id.*

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). "Good reasons" are required even when the conclusion of the ALJ may be justified based on the record as a whole. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). "If the ALJ does not accord the opinion of the treating source controlling weight, it must apply certain factors" to assign weight to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.*

Relevant here, Dr. Minn-Jinn found Plaintiff had a poor ability to maintain attention and concentration; respond appropriately to changes in routine; interact appropriately with the public, coworkers, and supervisors; deal with work stress; and complete a normal workday and workweek without interruption for psychologically based symptoms. (Tr. 582-83). Plaintiff claims the ALJ did not provide good reasons for affording Dr. Minn-Jinn's opinion "less weight"

because the decision is "marked by the absence of any reasoning at all" and the ALJ "merely provided a recitation of the treating psychiatrist's findings and stated the [d]octor's 'conclusions are not supported by the evidence of record.'" (Doc. 16, at 16). For the following reasons, the Court agrees.

In *Friend v. Commissioner of Social Security*, 375 F. App'x 543, 551 (6th Cir. 2010), the Sixth Circuit explained a conclusory explanation for discounting a treating physician's opinion is insufficient:

> The ALJ's rationale for discounting [the treating physician's] opinion was expressed simply as "the testimony of [the non-treating physician], which would allow the claimant to stand/walk for one hour [at a] time to a total of six hours in an eight hour workday, is more consistent with the objective clinical findings," and "there is no basis for [the treating physician's] conclusion that the claimant can stand/walk for only one hour in a day." This is not "sufficiently specific" to meet the requirements of the rule on its face, inasmuch as it neither identifies the "objective clinical findings" at issue nor discusses their inconsistency with [the treating physician's] opinion.

The court then concluded: "Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Id.* at 552.

Like *Friend*, the instant ALJ summarily stated, Dr. Minn-Jinn's "conclusions are not supported by the evidence of record." (Tr. 158). The ALJ did not make "some effort to identify the specific discrepancies" between Dr. Minn-Jinn's opinion and the "evidence of record." *Friend*, 375 F. App'x at 551. This analysis, or lack thereof, is insufficient to satisfy the good reasons requirement of the treating physician rule.

However, the ALJ's error can be excused if harmless. A violation of the treating physician rule is harmless error if: 1) "a treating source's opinion is so patently deficient that the

Commissioner could not possibly credit it"; 2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or 3) "where the Commissioner has met the goal of § 1527(d)(2) – the provision of the procedural safeguard of reasons – even though she has not complied with the terms of the regulation." *Wilson*, 378 F.3d at 547.

      In this case, Dr. Minn-Jinn's opinion is not "patently deficient" nor did the ALJ adopt all of Dr. Minn-Jinn's functional limitations into the RFC. Moreover, this is not a case where the ALJ's discussion of other opinions makes clear the basis on which Dr. Minn-Jinn's restriction was rejected. Rather, the ALJ simply stated Dr. Pickholtz' opinion was thorough and supported by objective medical evidence and the state agency consultants' assessments were "supported by the record as a whole." (Tr. 16). *See Friend*, 375 F. App'x at 552 (conclusory discussion of another opinion insufficient to show harmless error). The ALJ's conclusory treatment of *all* of the opinion evidence fails to satisfy the goals of the treating physician rule, i.e. to ensure adequacy of review and to permit the claimant to understand the disposition of her case. *Coldiron v. Comm. of Soc. Sec.*, 391 F. App'x 435, 440 (6th Cir. 2010).

      Furthermore, the Court is given pause by Plaintiff's uncontested claim that the state agency examiners never considered Dr. Minn-Jinn's opinion or various emergency department records from 2009 and 2011. (Doc. 16, at 11); *see*, *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) and *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (an ALJ must consider all relevant evidence *and* provide good reasons for the weight afforded to opinion evidence).

      In short, violation of the "good reasons" rule requires remand even where the ALJ's decision may be otherwise supported by substantial evidence. *Wilson*, 378 F.3d at 543-46; *see also Rogers*, 486 F.3d at 243. Therefore, remand is required for the ALJ to explain his reasoning

18

with respect to Dr. Minn-Jinn's opinion.

***RFC Determination***

While there may be substantial evidence in the record to support the ALJ's RFC determination, until the ALJ provides clearly sufficient reasons for affording treating physician Dr. Minn-Jinn's opinion "less weight", the Court abstains from determining whether the RFC is supported by substantial evidence.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds the ALJ failed to follow the treating physician rule. Accordingly, this matter is remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

IT IS SO ORDERED.

s/James R. Knepp, II
United States Magistrate Judge